IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MICHAEL DRIGGS, *et al.*,
    Plaintiffs,

      v.                           Civil No. 1:23cv1124 (DJN)

CENTRAL INTELLIGENCE AGENCY,
    Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on the parties' cross-motions for summary judgment and Plaintiffs' Motion for *In Camera* Inspection. (ECF Nos. 37, 41, 46.) Plaintiffs challenge the propriety of the Central Intelligence Agency's ("Defendant" or "CIA") redactions to two documents provided to Plaintiffs in response to Freedom of Information Act ("FOIA") requests filed with the agency. For the reasons set forth below, the Court will DENY Plaintiffs' Motions for Summary Judgment and *In Camera* Inspection (ECF Nos. 41, 46) and GRANT the CIA's Motion for Summary Judgment (ECF No. 37).

## I.     BACKGROUND

Because summary judgment requires an assessment of the undisputed facts, Local Civil Rule 56(B) directs a movant to include a list of undisputed material facts, to which the opposing party may respond. Local Civ. R. 56(B). The Court draws the following facts from the parties' briefs and from the record.

## A.    Historical Context

This FOIA suit seeks CIA records on Americans allegedly held as prisoners of war ("POWs") following the Korean and Vietnam Wars.[1]  Operation Homecoming, conducted by the United States in 1973, repatriated 591 American POWs at the end of the Vietnam War.  (ECF No. 42 ("Pl. Brief") at 2.)  Later that year, the Department of Defense ("DoD") reported to Congress that 1,300 soldiers listed as missing in action ("MIA") remained unaccounted for. (ECF No. 41-2 ¶ 12 n.2.)

Nineteen years later, in 1992, a Harvard professor examining Soviet archives discovered the "1,205 Document."  (FOIA Request at 12.)  This document — a Soviet transcript of a Vietnamese general's debriefing — reports that 1,205 American POWs were held in Southeast Asia prior to Operation Homecoming, a figure more than double the number of POWs ultimately repatriated as part of that operation.  (*Id.*)  In 1993, after the fall of the Soviet Union, Russia provided the United States with a Vietnamese wartime report (the "735 Document").  (Pl. Brief at 2.)  This document states that North Vietnam held 735 American pilot POWs around January 1971.  (*Id.*)  The discrepancy between the contents of these documents and the number of POWs brought home through Operation Homecoming has raised doubts as to the success of the United States' attempt to repatriate all Vietnam War POWs.  (ECF No. 41-2 at 14.)

In 1997, the Assistant to the President for National Security Affairs directed the United States Intelligence Community ("IC") to evaluate Vietnamese compliance with American POW retrieval efforts in the aftermath of the Vietnam War.  (Pl. Brief at 2.)  The following year, the CIA and DoD co-authored the National Intelligence Estimate ("NIE") in response to this request.

---

[1]    While the documents whose redactions Plaintiffs challenge for purposes of this action pertain solely to the aftermath of the Vietnam War, some of Plaintiffs' other FOIA requests also concern records related to the Korean War.  (*See, e.g.*, ECF No. 1-1 ("FOIA Request") at 6–9.)

(*Id.*)  The NIE's authors doubted the accuracy of the 1205 and 735 Documents and voiced these doubts in the NIE.  (ECF No. 50 ("CIA Reply Brief") at 14; ECF No. 41-5 at 2.)

United States Senator Robert Smith, who possessed significant working knowledge of the Vietnam POW issue,[2] responded with a 160-page report (the "Critical Assessment") criticizing the NIE and insisting on the veracity of the 1205 and 735 Documents.  (Pl. Brief at 3.)  In response to this critique, the CIA and DoD co-authored *A Review of the 1998 National Intelligence Estimate on POW/MIA Issues and the Charges Levied by A Critical Assessment of the Estimate* ("Review of the Charges"), which provided greater analysis and explanation in support of the NIE's conclusions.  (*Id.*; CIA Reply Brief at 14.)  To this day, the CIA has not fully declassified either of the documents.  (CIA Reply Brief at 1–2 (acknowledging the redactions to the documents giving rise to the instant suit).)

### B.    Parties and Venue

Lead plaintiff Michael Driggs is the nephew of Master Sergeant Robert Bibb, who "may have been captured" early in the Korean War.  (ECF No. 1 ("Compl.") ¶ 9.)  Robert Moore, Jana Orear, Christianne O'Malley, Thomas Logan, David Logan, Megan Marx, Terri Mumley, John Zimmerlee, Carol Hrdlicka, George Patterson, Mark Sauter and the POW Investigative Project, Inc., join in the suit.  (*Id.* ¶¶ 2–14.)  All but one of the individual plaintiffs lost a family member in the Korean or Vietnam Wars.  (*Id.* ¶¶ 2–12.)  Plaintiff POW Investigative Project, Inc., founded by Plaintiff Mark Sauter, is a nonprofit dedicated to "investigating the fates of United States POWs and MIAs."  (*Id.* ¶¶ 13–14.)

The Central Intelligence Agency remains headquartered in Arlington County, Virginia.

---

[2]    Senator Smith served as Chairman of the Vietnam War Working Group of the U.S.-Russia Joint Commission of POWs and MIAs in the 1990s.  (Pl. Brief at 3.)

The Eastern District of Virginia thus constitutes proper venue for these proceedings under 5 U.S.C. § 552(a)(4)(B).

### C.    Prior FOIA Proceedings

Not all Plaintiffs are new to this cause. Plaintiffs Moore, Orear, O'Malley and Sauter (together, the "Moore Plaintiffs") have been litigating FOIA cases regarding American POWs for at least seven years. *See Sauter v. Dep't of State*, No. 1:17-cv-1596, 2019 WL 3431153 (D.D.C. July 30, 2019) (filed in 2017); *Moore v. CIA*, No. 1:20-cv-1027, 2022 WL 2983419 (D.D.C. July 28, 2022) (filed in 2020).

As part of these pursuits, the Moore Plaintiffs sued the CIA in April 2020 to compel the production of records concerning American soldiers held captive after the Korean War. Complaint, *Moore* (D.D.C. Apr. 20, 2020), ECF No. 1. Over the next year and a half, the CIA produced records. The agency identified the Review of the Charges as a responsive document during its record search, but it withheld the document in full. (ECF No. 38-1 ¶ 8; ECF No. 53 ("Pl. Reply Brief") at 3.) In July 2022, Judge Royce C. Lamberth granted summary judgment to the CIA on the applicability of FOIA Exemptions 1, 3, and 6 to the responsive documents at issue, including the Review of the Charges, but denied summary judgment to both parties on the adequacy of the CIA's search, requesting more information. *Moore*, 2022 WL 2983419, at *1.

Nearly a month later, the Moore Plaintiffs moved to amend their complaint, which Judge Lamberth denied. Memorandum Order at 3, *Moore* (D.D.C. Mar. 30, 2023), ECF No. 46. Following Judge Lamberth's adverse rulings, the Moore Plaintiffs jointly stipulated with the CIA to dismiss their case pursuant to Federal Rule of Civil Procedure 41(a)(l)(A)(ii). Joint Stipulation, *Moore* (D.D.C. Apr. 24, 2023), ECF No. 49.

4

### D.    The Instant Litigation

Less than three months later, on July 12, 2023, the Moore Plaintiffs and Plaintiffs Driggs, Thomas Logan, David Logan, Marx, Mumley, Zimmerlee, Hrdlicka, Patterson and the POW Investigative Project, Inc. (collectively, "Plaintiffs") filed a new FOIA request with the CIA. (FOIA Request at 1; Compl. ¶ 14.)  That FOIA Request sought disclosure of twenty-eight items, many of which were duplicative of the requests at issue in *Moore*.  (FOIA Request at 6–11; ECF No. 38 ("CIA Brief") at 3.)

On August 16, 2023, having constructively exhausted their remedies under FOIA, Plaintiffs filed suit in this District.  (Compl. ¶¶ 18–20.)  The CIA answered Plaintiffs' Complaint on October 12, 2023.  (ECF No. 8.)  During a pretrial conference on March 13, 2024, the Court directed the parties to craft a schedule for "rolling production" of the CIA's records that would facilitate efficient resolution of the case and requested that the parties determine the issues remaining in dispute.  (ECF No. 22 ("Hr'g Tr.") 4:21–25; 5:8–12.)  Counsel for Plaintiffs noted that the parties had reached an impasse regarding the CIA's obligation to search its operational records and asked for permission to file Plaintiffs' position on that issue, which the Court granted.  (*Id.* 10:6–9; 10:14.)  In an order issued later that day, the Court directed the parties to provide briefing on the issue preclusive effect, if any, of the *Moore* case upon the instant litigation.  (ECF No. 18 at 1–2.)  In a subsequent order, the Court also directed the parties to file periodic joint status reports on the action's progress towards summary judgment.  (ECF No. 26.)

Plaintiffs filed a Memorandum briefing the issue of the CIA's obligation to search its operational records (ECF No. 19), to which the CIA responded (ECF No. 23).  The Court construed Plaintiffs' Memorandum as a motion to compel a search of the CIA's operational files pursuant to the CIA Information Act of 1984, 50 U.S.C. § 3141, and denied it, finding that

5

Plaintiffs failed to meet their legal burden under the CIA Information Act.[3]  (ECF No. 25 at 9–11.)

Over the course of this litigation, the CIA identified 130 records responsive to Plaintiffs' requests, totaling 1,578 pages.  (CIA Brief at 7; Pl. Brief at 10.)  The agency identified these records by selecting three different record systems and crafting individually tailored search terms.  (CIA Brief at 4–7.)  The CIA "conducted a document-by-document and line-by-line review" of the documents.  (ECF No. 38-1 ¶ 26.)  Ultimately, it released thirty-five records in full and eighty-five records in part, while withholding ten records entirely.  (CIA Brief at 7.)  Mary Williams, an original classification authority as specified by Executive Order ("E.O.") 13,526,[4] reviewed the redactions and affirmed their propriety, given their relation to "the priority of intelligence activities and targets, methods of collection, and classified relationships."  (*Id.* at 8–9.)  Ms. Williams submitted two affidavits detailing the justifications for the redactions.[5] (ECF Nos. 38-1 ("First Affidavit"), 50-2.)

The parties' penultimate joint status report, dated February 10, 2025, indicated that the parties had narrowed the issues to (1) the propriety of the "redactions made under FOIA exemption (b)(1) and (b)(3) for one of the records released on December 3, 2024" and (2) the adequacy of the CIA's search, although Plaintiffs "may not challenge Defendant's search for

---

[3]      The Court provided a detailed overview and legal analysis of the CIA Information Act in its May 21, 2024 Memorandum Order.  (ECF No. 25 at 1–5.)

[4]      E.O. 13,526 specifies the circumstances under which agencies may classify information related to national security.  *See infra*, Sections II, III.D.1.

[5]      The Court primarily relies on Ms. Williams's first affidavit (ECF No. 38-1), since her second affidavit largely restates the same arguments.  To the extent that Ms. Williams's second affidavit lays out new arguments on the propriety of the redactions to the Critical Assessment, these prove irrelevant to the Court's inquiry, since Plaintiffs have waived their claims concerning these redactions.  *See infra*, Section III.A.

records." (ECF No. 34 ¶ 3.)  In their final joint status report, dated February 28, 2025, the parties stated that, in light of their inability to resolve all disputed issues, they would move for summary judgment, and that Plaintiffs might also "move for *in camera* review of the released record to which Plaintiffs seek to challenge the redactions." (ECF No. 35 ¶ 2.)

On April 23, 2025, the CIA moved for summary judgment on the adequacy of its search and the applicability of FOIA Exemptions 1 and 3 to its redactions to one document, the Review of the Charges. (ECF No. 37.)  On May 21, 2025, Plaintiffs cross-moved for summary judgment to compel the disclosure of the redactions to two documents, the Review of the Charges and the Critical Assessment. (ECF No. 41.)  On the same date, Plaintiffs moved for *in camera* inspection of the documents at issue. (ECF No. 46).  The CIA filed responses to both motions on June 4, 2025. (ECF Nos. 51, 52.)  Plaintiffs filed replies on June 18, 2025, rendering the motions ripe for review. (ECF Nos. 53, 54.)

## II.    STANDARD OF REVIEW

The "basic thrust" of the Freedom of Information Act, 5 U.S.C. § 552, was to "pierce the veil of administrative secrecy and open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976) (quotation omitted).  To that end, FOIA generally requires federal agencies to provide their internal records to the public upon request.  5 U.S.C. § 552(a)(3)(A).  But, because "legitimate governmental and private interests could be harmed by the release of certain types of information," FOIA contains nine enumerated exemptions from disclosure, which "should be narrowly construed to favor disclosure." *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 290 (4th Cir. 2004).  The Act provides for de novo judicial review of an agency's response to a FOIA request, allowing courts "to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

7

In the instant action, the CIA asserts that FOIA Exemptions 1 and 3 apply. Exemption 1 protects from disclosure any documents that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). When invoking FOIA Exemption 1, agencies typically rely on E.O. 13,526, issued on December 29, 2009, which lays out the procedures necessary to classify information impinging on national security. Exec. Order No. 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009); *see, e.g.*, *Schaerr v. U.S. Dep't of Just.*, 69 F.4th 924, 929 (D.C. Cir. 2023) (noting that "[t]he Agencies all relied on Executive Order 13,526" to support their arguments for non-production or redaction of documents under FOIA Exemption 1).

By contrast, FOIA Exemption 3 protects matters that have been specifically exempted from disclosure by statute, if that statute "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). It is well established that the National Security Act of 1947, 50 U.S.C. §§ 3001–3244, and the CIA Act of 1949, 50 U.S.C. §§ 3501–3533, "are considered exemption statutes for the purposes of [FOIA] Exemption 3." *Moore*, 2022 WL 2983419, at *9 (citing *DiBaccio v. Dep't of Army*, 926 F.3d 827, 834 (D.C. Cir. 2019)).

In a FOIA suit, the "strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). The relevant agency "can meet this burden by describing the withheld material with reasonable specificity and explaining how it falls under one of the enumerated exceptions." *Hanson*, 372 F.3d at 290. Agencies normally fulfill this burden by submitting

affidavits. A court "is entitled to accept the credibility of the affidavits, so long as it has no reason to question the good faith of the agency." *Spannaus v. U.S. Dep't of Justice*, 813 F.2d 1285, 1289 (4th Cir. 1987) (quotations omitted).

To determine whether agencies have complied with their obligations under FOIA, courts have discretion to examine agency records *in camera*. 5 U.S.C. § 552(a)(4)(B). Courts exercise this discretion primarily when an agency has failed to carry its burden to justify withholding documents or information. *Simmons v. U.S. Dep't of Just.*, 796 F.2d 709, 712 (4th Cir. 1986); *see Young v. CIA*, 972 F.2d 536, 539 (4th Cir. 1992) (affirming grant of summary judgment to the CIA without *in camera* review when the agency met its burden through affidavits).

Summary judgment is appropriate where the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the Court "construe[s] the evidence in the light most favorable" to the nonmovant and "draw[s] all reasonable inferences in their favor." *Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 358 (4th Cir. 2009). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation omitted). In the FOIA context, "cases are generally resolved on summary judgment once the documents at issue have been properly identified." *Wickwire Gavin, P.C. v. U.S. Postal Serv.*, 356 F.3d 588, 591 (4th Cir. 2004). Summary judgment usually constitutes the proper mechanism for such cases, because "[w]hether a document fits within one of FOIA's prescribed exemptions is . . . a matter of law." *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272, 276 (4th Cir. 2010). "[S]ummary judgment on the basis of . . . agency affidavits is warranted if the affidavits

9

describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).

### III.    ANALYSIS

At the outset, the Court notes that the parties appear to disagree on what precisely remains at issue. The CIA, filing first, briefed the question of collateral estoppel, the propriety of redactions to the Review of the Charges, and the sufficiency of its search and segregability analysis. (CIA Brief at 12–25.) Plaintiffs' brief did not challenge the search,[6] but it challenged the redactions to both the Review of the Charges and the Critical Assessment. (Pl. Brief at 11.) The Court begins by providing a brief summary of the parties' respective arguments before considering the relevant claims put forward by the parties.

Plaintiffs raise multiple arguments in favor of summary judgment and *in camera* review. As a threshold matter, Plaintiffs allege that the CIA exhibited bad faith in the drafting of the National Intelligence Estimate, which, in their view, rebuts any presumption of good faith for the CIA. (*Id.* at 11–13.) They proceed to argue that in the specific context of this case, given the age of the records, the manner in which the IC received this information and the CIA's alleged practice of overclassification, no justification exists to withhold the redacted portions of the Review of the Charges and the Critical Assessment. (*Id.* at 16, 20; Pl. Reply Brief at 8–9.) Plaintiffs further argue that the withholdings violate Executive Order 12,812, which directed the review of documents "pertaining to American POWs and MIAs lost in Southeast Asia for the

---

[6]    Because Defendant seeks summary judgment on the sufficiency of its search and because Plaintiffs fail to contest this issue, the Court's grant of summary judgment to Defendant encompasses this issue as well.

purposes of declassification," Exec. Order No. 12,812, 57 Fed. Reg. 32,879 (July 22, 1992), and both Section 1.7 and the automatic declassification provision of Executive Order 13,526. (Pl. Brief at 16–18.) Finally, they assert that the CIA's affidavits lack the specificity required to carry the agency's burden on summary judgment, and they request that the Court conduct *in camera* review to ensure that the CIA is not improperly withholding information. (*Id.* at 15–20.) Regarding Defendant's collateral estoppel claim, Plaintiffs cite to FOIA Requests 27 (the Review of the Charges) and 28 (the Critical Assessment), which constitute new requests beyond the scope of anything settled in *Moore*, and which are therefore not precluded by this prior litigation. (Pl. Brief at 4–11.) For all these reasons, Plaintiffs request that the Court either order the CIA to disclose the challenged redacted material or conduct *in camera* review of the redactions to determine whether the CIA has complied with its obligations under FOIA. (*Id.* at 20.)

The CIA advances several arguments for summary judgment in its favor. The agency makes two procedural arguments: that collateral estoppel bars the Moore Plaintiffs from bringing this suit,[7] (CIA Brief at 12–15), and that Plaintiffs forfeited their right to challenge the withholding of the Critical Assessment based on the representations that they made in the joint status reports. (CIA Reply Brief at 20–21.) On the merits, the CIA argues that the affidavits provided by Ms. Williams, the CIA's classification authority, satisfy the requirements for an

---

[7]     Based on its own concerns about potential procedural gamesmanship by Plaintiffs, the Court raised the question of collateral estoppel in the March 13, 2024 pretrial conference and expressed its view that Plaintiffs shall not secure "a second bite at the apple." (Hr'g Tr. 7:22–23.)

The CIA also raised arguments concerning the potential issue-preclusive effect of *Moore* on Plaintiffs' claims concerning the adequacy of the CIA's search for documents. (CIA Brief at 16–18.) Since Plaintiffs no longer appear to challenge the adequacy of the search, however, the Court need not address those arguments.

award of summary judgment based on FOIA Exemptions 1 and 3. (*Id.* at 18–22.) Concerning Plaintiffs' arguments alleging bad faith, Defendant submits that the necessary showing to overcome the presumption of good faith must be a showing of bad faith *in the ongoing FOIA action*, not during earlier, underlying agency action that led to the generation of the records at issue. (CIA Reply Brief at 12–14.) In any event, the CIA argues that the NIE was not drafted in bad faith. (*Id.* at 14–15.) Defendant likewise contests Plaintiffs' arguments concerning the specific context of this case, the age of the documents, and compliance with various Executive Orders, arguing that neither the context nor the age of the documents are legally cognizable facts as presented, and that the Executive Orders' declassification obligations do not apply, since the documents are exemptible from E.O. 13,526's automatic declassification provision and E.O. 12,812 predates the genesis of the Review of the Charges. (*Id.* at 15–19.)

The Court begins by addressing Defendant's arguments on waiver and collateral estoppel. Then, the Court will address the threshold question of bad faith and the central question of the CIA's burden on a summary judgment motion pursuant to FOIA Exemptions 1 and 3. The bad faith inquiry and the question of whether the CIA has met its summary judgment burden intertwine, because if Plaintiffs fail to allege cognizable bad faith, the CIA affidavits retain their good faith presumption and will suffice to carry the CIA's burden for summary judgment. Finally, the Court assesses whether *in camera* review is proper.

### A.    Waiver

The CIA contends that Plaintiffs have forfeited their right to challenge the redactions to the Critical Assessment, because they represented — in joint status reports and in an email exchange with CIA counsel — that they were challenging only the Review of the Charges. (CIA Reply Brief at 20–21.) Plaintiffs concede that they "inadvertently neglected" to inform the CIA

of their challenge to the redactions to the Critical Assessment, but they distinguish the present

case from other FOIA cases where joint status reports were held to bind the parties by pointing to

"the unusual circumstance [that] the challenged record was written in response to the omitted

record." (Pl. Brief at 11; Pl. Reply Brief at 14.)

When parties in a FOIA litigation agree to narrow the issues in a written status report,

"they generally may be held to their agreement under traditional waiver principles."[8] *Am. Ctr.*

*for L. & Just. v. U.S. Dep't of Just.*, 325 F. Supp. 3d 162, 168 (D.D.C. 2018).[9] This approach

stands consonant with civil practice and the Federal Rules of Civil Procedure, which rely on the

routine narrowing of issues between litigants through means like pretrial conferences to provide

for the "just, speedy, and inexpensive determination of every action." *Id.* (quoting Fed. R. Civ. P.

1 and citing Fed. R. Civ. P. 16(c)(2)(A)); *see also id.* (noting that written stipulations can waive

the right to a jury trial or dismiss the action with prejudice and citing Federal Rules of Civil

Procedure 39(a)(1) and 41(a)(1)(A)(ii) in support). In the FOIA context, courts have repeatedly

found joint status reports to bind the parties. *Id.* ("[W]ritten status reports often play the same

role in FOIA cases as pretrial conferences do in other civil litigation."); *DeFraia v. CIA*, 311 F.

Supp. 3d 42, 47 (D.D.C. 2018) ("But it is the Joint Status Report, not Mr. DeFraia's original

request, that controls."); *Gilman v. U.S. Dep't of Homeland Sec.*, 32 F. Supp. 3d 1, 22 (D.D.C.

---

[8]     While the CIA argued for forfeiture, the Court finds that waiver constitutes the proper procedural mechanism here. *See Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*, 325 F. Supp. 3d 162, 167–69 (D.D.C. 2018) (finding waiver rather than forfeiture in FOIA litigation).

[9]     A brief survey of FOIA cases demonstrates that the Fourth Circuit and this Court often treat D.C. Circuit and D.C. District Court opinions as persuasive authority in such litigation, based on these courts' extensive experience with the statute. *See, e.g., Empower Oversight Whistleblowers & Research v. Nat'l Insts. of Health*, 122 F.4th 92, 101 (4th Cir. 2024) (citing as authoritative D.C. Circuit and D.D.C. cases); *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 292-93 (4th Cir. 2004) (citing D.C. Circuit cases); *City of Va. Beach v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1253 (4th Cir. 1993) (same); *Carter, Fullerton & Hayes, LLC v. FTC*, 601 F. Supp. 2d 728, 735 (E.D.Va. 2009) (same).

2014) (finding "[t]he plain meaning of the joint status report" controlling). FOIA's text itself, which provides that the requestor may later "limit the scope of the request," supports this conclusion. *DeFraia*, 311 F. Supp. 3d at 47 (quoting 5 U.S.C. § 552(4)(A)(viii)(II)(bb), (6)(B)(ii)).

Accordingly, the Court finds that Plaintiffs have waived their right to challenge the redactions to the Critical Assessment. An email from Plaintiffs' attorney, dated February 2, 2025, identifies the redactions to the Review of the Charges as "the only redactions that the plaintiffs will challenge." (ECF No. 51-3 at 77.) Meanwhile, the February 10, 2025 Joint Status Report, signed by attorneys for both parties, contains a paragraph setting forth "the issues that Plaintiffs intend to continue to pursue in this action." (ECF No. 34 ¶ 3.) That paragraph discusses only two issues: parameters for the search for records and Plaintiffs' desire "to understand the basis for redactions . . . *for one of the records*." (*Id.* (emphasis added).) Finally, the parties' February 28, 2025 Joint Status Report relates that "the parties will cross move for summary judgment and Plaintiffs may move for *in camera* review of the released *record* to which Plaintiffs seek to challenge the redactions." (ECF No. 35 ¶ 2 (emphasis added).) Indeed, Plaintiffs' summary judgment brief concedes that "the undersigned inadvertently neglected to inform defendant that plaintiffs also challenge the redactions to Senator Smith's *Critical Assessment*." (Pl. Brief at 11.) The Court holds Plaintiffs to their representations in the two joint status reports. As such, the Court determines that Plaintiffs waived their right to challenge the redactions to the Critical Assessment, leaving only Defendant's redactions to the Review of the Charges at issue in this case.[10]

---

[10]    The Court notes that, while Judge Lamberth in *Moore* required specific language such as "narrow" or "withdraw" to indicate waiver, the status report in *Moore* was not a *joint* status

## B.    Collateral Estoppel

The doctrine of collateral estoppel dictates that when "an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 148 (2015).  Collateral estoppel constitutes an affirmative defense on which the party asserting the defense bears the burden of proof.  Fed. R. Civ. P. 8(c)(1); *see Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) ("[A] party asserting preclusion must carry the burden of establishing all necessary elements.") (quoting 18 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure*, § 4405 (2d ed. 2002)).  While collateral estoppel can, in rare circumstances, preclude individuals who were not parties to the original litigation, the party asserting such nonmutual estoppel must demonstrate that the nonparty falls into one of the six categories outlined in *Taylor v. Sturgell*, 553 U.S. at 893–95.

Plaintiffs and the CIA disagree on whether the issues in the instant case present identical issues of fact or law as in the *Moore* litigation.  Plaintiffs argue against this identity for several reasons.  First, Plaintiffs submit that Requests 27 (for the Review of the Charges) and 28 (for the Critical Assessment) were not made in *Moore*.  (Pl. Brief at 5–6.)  Second, while the version of the Review of the Charges that the CIA released during the *Moore* litigation in June 2021 omitted numerous pages in their entirety, it technically did not contain any redactions; as such,

---

report.  *Moore*, 2022 WL 2983419, at *3.  Further, *American Center*, which *Moore* cites approvingly, relies on language similar to that present in the February 10, 2025 Joint Status Report.  *Compare Am. Ctr.*, 325 F. Supp. 3d at 169 ("to address the *remaining unsolved issues*") (emphasis added in original), *with* ECF No. 34 ¶ 2 ("the parties have been discussing *the issues that remain in this case*") (emphasis added).  *Moore*, therefore, does not alter the Court's outcome here.

"the propriety of the redactions . . . is not an issue that has been before any court." (*Id.* at 6–7.) Third, Plaintiffs argue that the identification of the Review of the Charges in *Moore* as a responsive document was erroneous, as the requests in *Moore* concerned Korean War POWs, whereas the Review of the Charges relates only to the Vietnam War. (*Id.* at 6.) And finally, Plaintiffs point to the production of differing records in this litigation. (*Id.* at 7–8.) Beyond the question of whether the litigation presents an identical issue of law or fact, Plaintiffs also contend that the participation of new parties in the instant litigation defeats any collateral estoppel argument. (*Id.* at 8–9.)

Plaintiffs' arguments on identity of the issues focus on distinctions that make no legal difference. In *Moore*'s partial summary judgment opinion, Judge Lamberth issued a final ruling granting summary judgment to the CIA on the propriety of withholding the Review of the Charges — the same document that Plaintiffs seek in the instant litigation — pursuant to FOIA Exemptions 1 and 3. *Moore*, 2022 WL 2983419, at *1. The CIA in *Moore* expressly invoked these FOIA Exemptions to justify withholding the Review of the Charges in full. (*Id.* at *3 n.2.) If Exemptions 1 and 3 justify withholding the document in full, then they also, of logical necessity, justify withholding whatever portions of the document that the CIA subsequently redacted in the context of this litigation. Plaintiffs' argument concerning an identical issue of fact or law therefore falls flat.

The *Moore* litigation also satisfies the other required showings for a finding of collateral estoppel in the instant case. Because the CIA's motion for summary judgment hinged on the applicability of the FOIA Exemptions, that issue was clearly "essential to the judgment." *B & B*

*Hardware*, 575 U.S. at 148. Summary judgment constitutes "a final and valid judgment".[11] *Id.* And the record demonstrates that both sides fully briefed the applicability of the FOIA Exemptions to the Review of the Charges in *Moore*, rendering the issue "actually litigated." *Id.*; *see* Vaughn Index at 26–27, *Moore* (D.D.C. Dec. 29, 2021), ECF No. 22-1 (describing a document withheld pursuant to Exemptions 1 and 3 as "the classified version of the joint Department of Defense and CIA report of POW/MIA issues"); Motion for Summary Judgment by CIA at 6–11, *Moore* (D.D.C. Dec. 10, 2021), ECF No. 21 (briefing the applicability of Exemptions 1 and 3); Cross Motion for Summary Judgment at 23–26, *Moore* (D.D.C. Jan. 17, 2022), ECF No. 25 (same).

However, Plaintiffs are correct that collateral estoppel only bars the Moore Plaintiffs in this case. The CIA, bearing the burden of proof, fails to advance any arguments that the remaining plaintiffs ought to be barred under one of the exceptions to the rule of nonparty preclusion set out in *Taylor v. Sturgell*, 553 U.S. at 893–95. Indeed, it "only contends that issue preclusion prevents the *overlapping* Plaintiffs" from relitigating the issue. (CIA Reply Brief at 8 n.5.) As such, the non-overlapping Plaintiffs stand entitled to pursue this litigation without the *Moore* litigation providing a procedural bar.

In sum, the Court finds that collateral estoppel bars Robert Moore, Jana Orear, Christianne O'Malley, and Mark Sauter from this suit. The Court will therefore dismiss those Plaintiffs. The Court proceeds to analyze the remaining arguments concerning the Review of the Charges as to Plaintiffs Driggs, Thomas Logan, David Logan, Marx, Mumley, Zimmerlee, Hrdlicka, Patterson, and the POW Investigative Project, Inc., only.

---

[11]    Plaintiffs do not contest this prong of the collateral estoppel test. The Court notes that Plaintiffs did not appeal Judge Lamberth's grant of partial summary judgment on these issues, rendering the judgment final and valid.

## C.    Bad Faith

Moving from procedure to substance, the Court considers the critical question underlying this litigation: whether the remaining Plaintiffs have adequately alleged bad faith by the CIA to render the agency's affidavits insufficient. For the reasons that follow, the Court finds that they have not.

Allegations of bad faith are relevant to the assessment of a FOIA claim for impermissible withholding of documents, because they speak to the sufficiency of an agency's affidavits in meeting that agency's burden, which in turn allows the agency to prevail on summary judgment. *See Schaerr*, 69 F.4th at 929 ("[C]ourts must grant summary judgment for an agency if its affidavit: (1) describes the justifications for nondisclosure with reasonably specific detail; and (2) is not substantially called into question by contrary record evidence or evidence of agency bad faith." (quotation omitted). Agency affidavits receive a presumption of good faith. *Spannaus*, 813 F.2d at 1289 (holding that a court "is entitled to accept the credibility of the affidavits, so long as it has no reason to question the good faith of the agency."). The deference attendant on this presumption applies especially in the national security context. *See Bowers v. U.S. Dep't of Just.*, 930 F.2d 350, 357 (4th Cir. 1991) ("What fact or bit of information may compromise national security is best left to the intelligence experts. If there is no reason to question the credibility of the experts and the plaintiff makes no showing in response to that of the government, a court should hesitate to substitute its judgment of the sensitivity of the information for that of the agency."); *see also Schaerr*, 69 F.4th at 929 ("Because withholding national security information is a uniquely executive purview, we exercise great caution before compelling an agency to release such information." (internal quotation omitted)); *Simmons*, 796 F.2d at 711 ("In judging agency decisions and affidavits in the area of national security,

however, courts have given substantial weight to the expertise of the agencies charged with determining what information the government may properly release."). Mere allegations of bad faith, however, will not suffice to overcome the presumption of good faith. *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979) ("The sufficiency of the affidavits is not undermined by a mere allegation of agency misrepresentation or bad faith, nor by past agency misconduct in other unrelated cases."). Rather, plaintiffs must provide "tangible evidence of bad faith" to overcome the presumption. *Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987).

Plaintiffs argue that the drafting of the NIE demonstrates bad faith on the part of the CIA, and that this bad faith sufficiently tinges the Review of the Charges to overcome the presumption of good faith as to the CIA's representations in this case and render *in camera* review of the documents in question proper. (Pl. Reply Brief at 12–14.) Specifically, Plaintiffs submit:

> The NIE misrepresents, and omits, evidence corroborating the 1205/735 numbers. The NIE falsely portrays Vietnamese cooperation as excellent. It unjustifiably impugns the credibility of sources. It ignores, and omits, evidence of POW transfers to the USSR. It misrepresents, and omits, evidence of second prison [sic] system. It misrepresents, and omits, corroborative accounts by Russian sources. The NIE disparages the genuineness of the documents, neglecting to reveal that numerous intelligence reports attest to their authenticity. It posits that the date is wrong, and the length is wrong. And it even questions whether there ever existed a transcript in the Vietnamese language.

(Pl. Brief at 12–13 (citations omitted).)

Plaintiffs cite this alleged bad faith drafting to argue that the CIA is engaging in a cover up *today* by not disclosing the challenged redactions. (*See* Pl. Brief at 25 ("Plaintiffs opine that the redactions are made to conceal the veracity of the numbers in the 1205/735 Documents…"); *id.* at 20 ("While the CIA claims that its withholdings are made in good faith, Senator Smith's account is to the contrary…").) In support of their contention that a showing of bad faith during

19

the *generation* of a record constitutes legally cognizable bad faith in the context of a FOIA suit, Plaintiffs cite one out-of-circuit case: *Rugiero v. U.S. Department of Justice*, 257 F.3d 534, 544 (6th Cir. 2001) ("Evidence of bad faith on the part of the agency can overcome this presumption [of good faith], even when the bad faith concerns the underlying activities that generated the FOIA request rather than the agency's conduct in the FOIA action itself.").

The CIA rejects Plaintiffs' argument for several reasons. First, the CIA argues that Plaintiffs' theory — that agency misconduct in the generation of the relevant records defeats the agency's good faith presumption — has never been recognized in the Fourth Circuit. (CIA Reply Brief at 12–13.) Furthermore, it argues that, even if the Fourth Circuit recognized this theory, the evidence in the record demonstrates that the agency acted only in good faith. (*Id.* at 14–15.) As the released portion of the Review of the Charges indicates, the NIE did not closely scrutinize the 735 and 1205 Documents; rather, its author "assumed that the NIE would reflect the best judgments of the IC as developed by knowledgeable analysts," who found the documents to be unreliable. (ECF No. 41-5 at 1–2.) Indeed, addressing the 735 and 1205 Documents in detail was to be "a separate research project." (*Id.* at 1.) Senator Smith's scathing critique reacted, on this read, to a misperception of the NIE's purpose. (*Id.* at 2.)

As to the question of whether agency misconduct in the generation of records defeats the agency's good faith presumption, the overwhelming weight of the case law supports the CIA's position. In *Schaerr v. U.S. Department of Justice*, for example, the plaintiff sued six intelligence agencies to compel production of documents relating to the "unmasking" of members of President Trump's election campaign.[12] 69 F.4th at 931. The plaintiff alleged two

_____

[12]     When conducting electronic surveillance on foreign targets, intelligence agencies will, as a matter of course, incidentally collect some communications between the target and American

20

instances of agency bad faith to overcome the agency affidavits' presumption of good faith. *Id.*
First, a former United Nations Ambassador had allegedly requested the "unmasking" of many
members of President Trump's team. *Id.* Second, the plaintiff claimed that the agencies spied
on the President's campaign and transition teams. *Id.* The D.C. Circuit held that the allegations
were "either too generalized or too attenuated from the specific classification decisions at issue
to constitute the kind of 'tangible evidence of bad faith' we have required to overcome agency
affidavits." *Id.* (quoting *Carter*, 830 F.2d at 393). In other words, the bad faith had to be related
to "the specific classification decisions at issue." *Schaerr*, 69 F.4th at 931; *see also Hayden*, 608
F.2d at 1387 ("The sufficiency of the affidavits is not undermined by . . . past agency misconduct
in other unrelated cases."). Similarly, in *Larson v. Department of State*, the CIA withheld
intelligence cables that the plaintiff sought to obtain through a FOIA request. 565 F.3d 857, 863
(D.C. Cir. 2009). In affirming the district court's grant of summary judgment for the CIA, the
D.C. Circuit found that "[t]he parties present us with no evidence . . . suggesting bad faith on the
part of the CIA *in withholding the cables*." *Id.* at 864 (emphasis added).

While fewer examples abound in the Fourth Circuit, *Young v. CIA* explicitly tied the bad
faith inquiry to the FOIA declarations, stating that the plaintiff "does not allege that the CIA
acted in bad faith *in its declarations*." 972 F.2d at 539 (emphasis added).[13] Similarly, in
*Simmons v. United States Department of Justice*, the Fourth Circuit adopted the D.C. Circuit's
rule emphasizing that the good faith in question relates to the *affidavits*. *See Simmons*, 796 F.2d

---

citizens. *Schaerr*, 69 F.4th at 927. Because the Foreign Intelligence Surveillance Act requires
minimizing the collection of data on Americans, agencies substitute the identifying information
of individuals with generic labels. *Id.* This process is known as "masking." *Id.*

[13]    While Plaintiffs correctly point out that *Young* was applying an abuse of discretion
standard to the district court's decision to skip *in camera* review, the case nonetheless indicates
that the "bad faith" in FOIA inquiries must relate to the agency's actions while producing the
documents, not earlier agency activity.

at 712 ("The agency's affidavits, naturally, must be relatively detailed and nonconclusory and submitted in good faith. But if these requirements are met, the district judge has discretion to forgo discovery and award summary judgment on the basis of affidavits.") (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).

Plaintiffs' invocation of the Sixth Circuit's *Rugiero* case is unavailing — neither its reasoning nor its underlying factual predicate sway the Court. In *Rugiero*, the plaintiff claimed a host of bad faith actions by various defendants and argued that these earlier actions defeated the presumption of good faith for agency affidavits. *Rugiero*, 257 F.3d at 546. The plaintiff relied on an earlier case, *Jones v. FBI*, 41 F.3d 238 (6th Cir. 1994), where the Sixth Circuit had found that, "[e]ven where there is no evidence that the agency acted in bad faith with regard to the FOIA action itself[,] there may be evidence of bad faith or illegality with regard to the underlying activities which generated the documents at issue." *Rugiero*, 257 F.3d at 546 (quoting *Jones*, 41 F.3d at 242). In ultimately rejecting the plaintiff's bad faith argument, the Sixth Circuit found that "Rugiero misunderstands our discussion of bad faith in *Jones*." *Rugiero*, 257 F.3d at 546. Because the FBI investigation in *Jones* "went beyond the ordinary detection and prevention of criminal activity to well-documented infringements of civil liberties whose disclosure threatened public embarrassment of the FBI," the Sixth Circuit indicated that *Jones* "presented an unusual case and defined the collateral nature of bad faith in FOIA actions according to a very high standard that would infrequently be met"; the "routine investigation" in *Rugiero* did not meet this standard. *Rugiero*, 257 F.3d at 546–47. Even in the Sixth Circuit, then, the bar for collateral bad faith requires "well-documented infringements of civil liberties" or something of that ilk. *Id.* The Fourth Circuit has never adopted this test, nor is it likely that Plaintiffs meet the high standard specified therein.

22

Based on the weight of the case law, the Court finds that agency bad faith must relate to the present FOIA action in order to defeat the presumption of good faith afforded to agency affidavits. As such, Plaintiffs' allegations concerning the drafting of the NIE over twenty-five years ago cannot, as a matter of law, overcome the presumption of good faith in the CIA's affidavits.

Nor do Plaintiffs adequately allege bad faith in the CIA's present-day actions. The CIA's alleged "bad faith" in 1998 makes Plaintiffs suspicious of the agency's forthrightness today. (*See* Pl. Brief at 25 ("Plaintiffs opine that the redactions are made to conceal the veracity of the numbers in the 1205/735 Documents . . . .").) But to the extent that they allege a CIA cover-up in *this* litigation to avoid potential embarrassment to the agency *today*, Plaintiffs provide no more than conclusory allegations. (Pl. Brief at 11 ("Plaintiffs submit evidence that the CIA's NIE was written in bad faith. Thus, the Plaintiffs have good cause to believe that the CIA redacted information because it corroborates the numbers appearing in the 1205/735 Documents.").) Plaintiffs' "evidence" consists of Senator Smith's characterization of the NIE, as well as a statement in a 2016 affidavit that he "personally ha[s] seen hundreds of classified documents that could and should be released as they pose no national security risk" and that "[w]hat is really at risk are the reputations and careers of the intelligence officials who participated in and perpetrated this sorry chapter in American history." (Pl. Brief at 12–13 (citations omitted); ECF No. 41-1 ¶ 8.) This "evidence" — from 1998 and 2016, respectively — cannot speak to the CIA's response to the instant FOIA requests, which were made in 2023. Plaintiffs' conclusory allegations, then, do not undermine the affidavits' presumption of good faith.[14] As such, the

---

[14]    Because the Court finds that agency bad faith must relate to the present FOIA action and cannot be based on past behavior, it need not consider the question of whether the CIA acted in

Court rejects Plaintiffs' arguments as to bad faith on the part of the CIA and finds that the presumption of good faith applies to the CIA's affidavits in this case.

### D.    The CIA's Burden Under Exemptions 1 and 3

Having found that the presumption of good faith applies, the Court turns next to assessing whether the CIA has satisfied its burden to demonstrate that the redacted information falls within FOIA Exemptions 1 and 3.  The Court finds that it has.

To prevail on summary judgment in a FOIA action, the agency seeking to withhold information bears the burden of showing that the withheld material falls within a FOIA Exemption.  *Hanson*, 372 F.3d at 290.  Agencies "can meet this burden by describing the withheld material with reasonable specificity and explaining how it falls under one of the enumerated exceptions."  *Id.*  Courts grant summary judgment "if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Military Audit Project*, 656 F.2d at 738.

Here, the CIA has invoked Exemptions 1 and 3 to justify its redactions to the Review of the Charges.  The Court proceeds to analyze the showings required under both exemptions and whether the CIA has successfully made those showings.

---

bad faith during the drafting of the NIE.  It bears mentioning, however, that Plaintiffs' key piece of evidence allegedly supporting their claim of bad faith — the redacted version of the Critical Assessment — is in Plaintiffs' possession only because the CIA released it in 2016.  (Pl. Brief at 11–13; FOIA Request at 26.)  The fact that the CIA provided the document that Plaintiffs are using as evidence to suggest a cover-up further supports a finding that the CIA is acting in good faith for the purposes of this litigation.  *See Turse v. U.S. Dep't of Defense*, No. 1:22-cv-2970, 2025 WL 588203, at *4 (D.D.C. 2025) ("That Defendants have disclosed facts causing Plaintiff to question the legality of the drone strike, if anything, supports the good faith of the declarants.").

1.    **Exemption 1**

The CIA invoked Exemption 1 to justify some of its redactions to the Review of the

Charges.  This Exemption requires the CIA to establish that the redactions are (a) specifically

authorized to be kept secret in the interest of national defense or foreign policy under criteria

established by an Executive Order and (b) have been properly classified pursuant to that Order.

5 U.S.C. § 552(b)(1).

The CIA invokes Executive Order 13,526 as the relevant order authorizing its redactions.

(CIA Brief at 8.)  This Order permits classification of documents if:

> (1) an original classification authority is classifying the information; (2) the
> information is owned by, produced by or for, or is under the control of the United
> States Government; (3) the information falls within one or more of the categories
> of information listed in section 1.4 of this order; and (4) the original classification
> authority determines that the unauthorized disclosure of the information reasonably
> could be expected to result in damage to the national security, which includes
> defense against transnational terrorism, and the original classification authority is
> able to identify or describe that damage.

E.O. 13,526 § 1.1(a)(1–4).

The CIA contends that it fulfills all of the procedural requirements set forth in E.O.

13,526 and that the information in question was properly classified pursuant to that Order.  For

the reasons set forth below, the Court agrees.

a.    ***Ms. Williams Has Original Classification Authority and the
United States Government Owns the Information.***

Section 1.3 of E.O. 13,526 grants "authority to classify information originally" to the

President, Vice President, "agency heads and officials designated by the President" and "United

States Government officials delegated this authority pursuant to paragraph (c) of this section."

*Id.* § 1.3(a).  Paragraph (c) indicates that "'Top Secret' original classification authority may be

delegated only by the President, the Vice President, or an agency head or official designated

pursuant to paragraph (a)(2) of this section." *Id.* § 1.3(c)(2). "Each delegation of original classification authority shall be in writing and the authority shall not be redelegated except as provided in this order." *Id.* § 1.3(c)(4). Ms. Williams' first affidavit testifies that she is "a senior CIA official and hold[s] original classification authority at the TOP SECRET level under written delegation of authority pursuant to section 1.3(c) of Executive Order ('E.O.') 13526." (First Affidavit ¶ 3.) Plaintiffs do not challenge these assertions.

Ms. Williams likewise states "that the information is owned and controlled by the U.S. Government." (*Id.* ¶ 16.) As such, and applying the presumption of good faith to Ms. Williams' statements, the Court finds that the CIA has satisfied requirements (1) and (2) for classification under E.O. 13,526.

### b. *The Information Falls Within One or More of the Categories Listed in Section 1.4.*

The CIA further claims that the redacted information falls within categories (c) and (d) as listed in Section 1.4 of E.O. 13,526. That section sets forth an exhaustive list of classification categories. As relevant here, Section 1.4(c) allows classification of information that pertains to "intelligence activities (including covert action), intelligence sources or methods, or cryptology," while Section 1.4(d) permits classification of information pertaining to "foreign relations or foreign activities of the United States, including confidential sources." E.O. 13,526 § 1.4(c), (d). The CIA identifies these categories as the types of information legally relevant under the Order. (CIA Brief at 8.)

Plaintiffs contest this claim, arguing that the CIA opines instead of offering facts. (Pl. Brief at 24.) Plaintiffs opine, in turn, that the redacted information does not pertain to these categories and that the redactions were made purely "to conceal the veracity of the numbers in the 1205/735 Documents, in violation of Executive Order 13,526." (*Id.* at 24–25.)

26

Yet, Plaintiffs only "evidence" in support of this assertion consists of their allegation of bad faith in the drafting of the NIE. Setting aside the contested nature of this allegation, the Court reiterates its earlier finding that evidence of former bad faith action does not suffice to overcome the good faith presumption accorded to the CIA affidavits. As such, the Court finds that the CIA sufficiently establishes that the redacted information falls into the claimed categories.

           ***c.***     ***Ms. Williams Determined That Disclosure Could Reasonably Be Expected to Harm National Security and Adequately Described That Harm.***

Ms. Williams's initial affidavit states that the CIA's redactions protect "the priority of intelligence activities and targets; methods of collection; and classified relationships" and that "the release of this information could significantly impair the CIA's ability to carry out its core missions of gathering and analyzing foreign intelligence and counterintelligence and conducting intelligence operations, thereby damaging national security." (First Affidavit ¶ 17.) Regarding intelligence activities, the affidavit declares that the

> redactions conceal the means, policies, and processes used to collect and analyze certain CIA intelligence interests and activities. Although it is widely acknowledged that the CIA is responsible for conducting intelligence collection and analysis for the United States, the CIA generally does not disclose the targets of specific intelligence collection activities or the operations it conducts or supports. Such disclosure would allow intelligence targets to circumvent the CIA's collection efforts, damaging the Agency's ability to carry out its intelligence mission. The [Review of the Charges] reflects certain priorities of specific U.S. intelligence targets, the locations of CIA activities, the targets of specific CIA operations and analysis, and Agency processes for handling intelligence information. Disclosing this type of detail could reasonably be expected to damage national security because it would greatly impair effective collection of foreign intelligence.

(*Id.* ¶ 18.)

The affidavit provides a similarly detailed account concerning the need to protect intelligence methods:

Intelligence methods must be protected to prevent foreign adversaries, terrorist organizations, and others from learning the ways in which the CIA operates, which would allow them to take measures to hide their activities from the CIA or target Agency officers. The more information the CIA discloses about its operational tradecraft, the more difficult it becomes for the CIA to actually collect foreign intelligence around the world. Clandestine information collection methods are valuable from an intelligence-gathering perspective only so long as they remain unknown and unsuspected. Once the nature of an intelligence method or the fact of its use in a certain situation is discovered, its usefulness in that situation is neutralized and the CIA's ability to apply that method in other situations is significantly degraded. Here, the documents contain specific types of intelligence methods, as well as policies and processes for utilizing those intelligence methods. Disclosure of these details would likely impair the CIA's ability to continue to collect intelligence and conduct operations.

(*Id.* ¶ 19.)

Finally, regarding the need to protect classified relationships, the affidavit describes the following:

The redactions here protect the process and policies for working with foreign services, foreign individuals, and/or clandestine assets and cooperative sources who aided the CIA in its intelligence gathering mission These details have been withheld because their disclosure would reveal intelligence priorities, and the CIA's information-sharing relationships with specific foreign individuals and governments . . . . Revelation of these relationships could hurt the Agency's relationship with these entities — entities that often agree to cooperate with the CIA on the understanding that the relationship will remain secret. Disclosing the details of these relationships could reasonably be expected to harm National security because it would reveal certain interests and activities of the U.S. Government, and could lead to the deterioration of relationships, thereby decreasing the CIA's access to information and potentially impacting U.S. diplomatic relations.

(*Id.* ¶ 20.)

The Court finds that the determinations made by Ms. Williams and the level of detail offered in the First Affidavit easily satisfy the CIA's burden under E.O. 13,526. *See Spannaus*, 813 F.2d at 1289 ("If the Government fairly describes the content of the material withheld and adequately states its grounds for nondisclosure, and if those grounds are reasonable and applicable with the applicable law, the district court should uphold the Government's position."

(quoting *Barney v. Internal Revenue Serv.*, 618 F.2d 1268, 1272 (8th Cir. 1980))).  Courts routinely arrive at the same conclusion when considering affidavits that proffer similar detail. *See, e.g.*, *Moore*, 2022 WL 2983419, at *5 (granting summary judgment based on a similar affidavit); *Va.-Pilot Media Cos. v. Dep't of Just.*, 147 F. Supp. 3d 437, 447–48 (E.D.Va. 2015) (same).

Plaintiffs, unsatisfied, assert that Ms. Williams's "claims are conclusory, and merely recite statutory standards," and that greater detail concerning the redacted information is required.  (Pl. Brief at 16.)  However, as is evident from the sections of the affidavit cited above, Ms. Williams provides far more than a recitation of statutory standards, explaining in detail why the documents in question meet these standards.  Meanwhile, the level of precision sought by Plaintiffs would likely disclose the sensitive information specifically protected under FOIA, running contrary to Congress's express intent in crafting the various FOIA exemptions.  Because the CIA's affidavit meets the standard that the Executive Order and the case law require, and because "[w]hat fact or bit of information may compromise national security is best left to the intelligence experts," the Court finds the affidavit's detail sufficient for purposes of this inquiry. *Bowers*, 930 F.2d at 357.

### d.    *Plaintiffs' Additional Objections Fail.*

Plaintiffs bring three additional arguments why the CIA's redactions fail to qualify under FOIA Exemption 1:  (1) the CIA has failed to follow the automatic declassification requirements of E.O. 13,526, § 3.3; (2) the CIA has failed to follow E.O. 13,526, § 1.7; and (3) E.O. 12,812 requires the CIA to lift these redactions.  (Pl. Brief at 12, 17–18.)  The Court rejects these arguments.

29

Plaintiffs allege that EO 13,526's automatic declassification provision mandates that the documents in question be declassified, rendering the CIA's continued insistence on redactions improper. (Pl. Brief at 17.) E.O. 13,526, § 3.3 sets out the standard for "Automatic Declassification." Under that provision, if a record is over twenty-five years old and has been determined to possess historical value, it "shall be automatically declassified on December 31 of the year that is 25 years from the date of origin, except as provided in paragraphs (b)–(d) and (g)–(j) of this section." E.O. 13,526 § 3.3(a).

The CIA and DoD authored the Review of the Charges in 2000. (First Affidavit ¶ 7 n.11.) As such, EO 13,526's automatic declassification provision will not apply until December 31 of this year.[15] Plaintiffs' claim of improper redactions on the basis of automatic declassification therefore fails.

Second, Plaintiffs argue that the CIA's redactions violate E.O. 13,526, § 1.7. (Pl. Brief at 12.) Section 1.7 directs that "[i]n no case shall information be classified, continue to be classified, or fail to be declassified in order to: (1) conceal violations of law, inefficiency, or administrative error; [or] (2) prevent embarrassment to a person, organization, or agency." E.O. 13,526 § 1.7(a)(1–2). As explained above, Plaintiffs have failed to provide more than conclusory allegations suggesting that a cover-up motivates the CIA's redactions. This argument therefore fails as well.

Finally, Plaintiffs allege that nondisclosure of the redactions to the Review of the Charges violates E.O. 12,812, which previously directed all executive departments and agencies to "expeditiously review all documents, files, and other materials pertaining to American POWs

---

[15]    While the CIA also argues that the records are "properly exemptible from the automatic declassification provision," the Court need not consider this argument, given that insufficient time has elapsed to trigger automatic declassification. (CIA Reply Brief at 17.)

and MIAs lost in Southeast Asia for the purposes of declassification." E.O. 12,812, § 2.  As the

CIA indicates, however, the directive implementing E.O. 12,812 required completion of these

declassification efforts by November 11, 1993.  (CIA Brief at 17.)  The Review of the Charges,

meanwhile, was not authored until 2000.  (First Affidavit ¶ 7 n.11.)  As such, EO 12,812's

directive toward declassification of POW-related materials by 1993 plainly does not apply to the

Review of the Charges, rendering Plaintiffs' argument meritless.

### 2.    Exemption 3

The CIA also invoked FOIA Exemption 3 to justify the redactions to the Review of the

Charges.  This exemption, which protects matters specifically exempted by statute, requires the

CIA to establish "the existence of a relevant statute and the inclusion of withheld material within

the statute's coverage."  *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007) (internal quotation

omitted).  Its applicability does not "depend[] on the detailed factual contents of specific

documents."  *Id.*

Here, the CIA invokes the National Security Act of 1947, 50 U.S.C. §§ 3001–3244, and

the CIA Act of 1949, 50 U.S.C. §§ 3501–3533, both of which "are considered exemption statutes

for the purposes of [FOIA] Exemption 3."  *Moore*, 2022 WL 2983419, at *9 (citing *DiBaccio*,,

926 F.3d at 834).  The National Security Act directs that "[t]he Director of National Intelligence

shall protect, and shall establish and enforce policies to protect, intelligence sources and methods

from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  The CIA Act, meanwhile, exempts the

CIA from "the provisions of any other law which require the publication or disclosure of the

organization or functions of the Agency, or of the names, official titles, salaries, of numbers or

personnel employed by the Agency."  50 U.S.C. § 3507.  Case law establishes that the CIA Act's

protections apply to both past and current personnel of the agency.  *See DiBaccio*, 926 F.3d at

31

835–36 ("we reject DiBaccio's argument that the CIA Act only applies to information referencing current intelligence personnel"); *Moore*, 2022 WL 2983419, at *9 (applying *DiBaccio*).

As their text reveals, the statutes cited by the CIA protect the exact sort of information that the CIA's First Affidavit asserts the redacted documents to contain: "intelligence sources and methods," 50 U.S.C. § 3024(i)(1), and "the organization and functions of the Agency," 50 U.S.C. § 3507. The CIA's affidavit describes how disclosure could compromise those types of information. (First Affidavit ¶¶ 18–25.) Given the Court's earlier finding of no bad faith, the Court finds that the CIA has met its burden to show that FOIA Exemption 3 applies. *See Schaerr*, 69 F.4th at 930 ("[G]ranting Schaerr's request would force the Agencies to reveal potentially sensitive intelligence information, interfering with their 'sweeping power to protect [their] intelligence sources and methods' under the Act. Divulging such information is 'specifically exempted' under the National Security Act and is therefore shielded from disclosure by FOIA Exemption Three." (alteration in original) (quoting *CIA v. Sims*, 471 U.S. 159, 169 (1985))); *Moore*, 2022 WL 2983419, at *10 ("Given that the CIA has provided an uncontradicted affidavit . . . [the records] are properly withheld under the National Security Act. This Court will not compel their disclosure."); *Larson*, 565 F.3d at 865 (Because the National Security Act is an exemption statute, "our only remaining inquiry is whether the withheld material relates to intelligence sources and methods . . . . [A]ccording substantial weight to the CIA's affidavits, we easily conclude that it does.").

Plaintiffs do not contest the statutes' applicability, but they argue that the CIA has provided an insufficient connection between the redacted comments and national security, and that intelligence officials were not concerned with public disclosure of POW information. (Pl.

32

Brief at 19–20.) But Exemption 3 requires no more than to establish that the redacted information falls within the statutes' coverage — something that the CIA's affidavit, whose good faith the Court must presume, easily accomplishes.

Plaintiffs' other objections are similarly irrelevant to the legal framework governing FOIA Exemption 3. Plaintiffs claim that the "context of the Russians' information," given in "a cooperative effort," counsels disclosure. (Pl. Reply Brief at 8–9.) They also provide an affidavit from Norman Kass, former Executive Secretary of the U.S.-Russian Joint Commission on POWs/MIAs, asserting that neither Russian nor American officials expressed concerns about public disclosure of information. (Pl. Brief at 19–20.) In addition, Plaintiffs assert that the age of the documents favors disclosure. (*Id.* at 16–17.) And finally, they quote Senator Smith's claim that he "personally ha[s] seen hundreds of classified documents that could and should be released as they pose no national security risk" and that "[w]hat is really at risk are the reputations and careers of the intelligence officials who participated in and perpetrated this sorry chapter in American history." (ECF No. 41-1 ¶ 8.)

Plaintiffs' assertions of historical context and the Kass affidavit fail to move the needle on the applicability of FOIA Exemption 3, which focuses solely on the availability and applicability of relevant protective statutes. And while the age of the documents might, in theory, favor disclosure, "[t]he judiciary is in an extremely poor position to second-guess the predictive judgments made by the government's intelligence agencies." *Larson*, 565 F.3d at 865 (internal citation omitted). In the absence of anything like E.O. 13,526's explicit guidelines for age as a factor in declassifying documents, the Court thus defers to the CIA on the issue of whether the relevant portions of the requested documents are properly classified. Finally, the Smith Affidavit speaks of overclassification generally and does not concern itself with the

redactions of the Review of the Charges in the instant FOIA action — the only issue presently before the Court. Nor could it, seeing as it was authored in August 2016, seven years before Plaintiffs initiated this FOIA proceeding.

In sum, the Court finds that Ms. Williams' affidavits sufficiently demonstrate that FOIA Exemptions 1 and 3 apply to the redactions to the Review of the Charges. As such, and given the absence of bad faith, the CIA meets its burden to receive summary judgment, which the Court will grant.

### E.    *In Camera* Review is Unnecessary

Having found that the CIA has met its burden in establishing the applicability of the FOIA Exemptions to the document in question, the Court turns to Plaintiffs' request for *in camera* review. (ECF No. 46.) As Plaintiffs correctly point out, courts resort to *in camera* review where an agency fails to meet its burden for summary judgment through affidavits. (ECF No. 47 at 1); *see Ethyl Corp. v. EPA*, 25 F.3d 1241, 1249 (4th Cir. 1994) ("[*In camera* review] need not be automatic. *An agency should be given the opportunity, by means of detailed affidavits or oral testimony*, to establish to the satisfaction of the District Court that the documents sought fall clearly beyond the range of material that would be available to a private party in litigation with the agency.") (quoting *EPA v. Mink*, 410 U.S. 73, 93 (1973)[16]) (emphasis in original). Conversely, where an agency meets its burden, a court need not use its discretion to order *in camera* review. *Young*, 972 F.2d at 539; *see also Hayden*, 608 F.2d at 1387 ("When the agency meets its burden by means of affidavits, In camera [sic] review is neither necessary nor

---

[16]    While *Mink*'s deferential treatment towards the 1973 iteration of FOIA Exemption 1 was changed by statute, the Fourth Circuit endorsed *Mink*'s standard for *in camera* review in 1994, well after the 1974 change to FOIA. *See CIA v. Sims*, 471 U.S. 159, 189 (1985) (Marshall, J., concurring) (recounting the reaction to *Mink*). *Mink*'s statutory rebuke, then, does not alter the legal standard for *in camera* review.

appropriate."). Having already found that the CIA met its burden here, the Court sees no need for *in camera* inspection of the redacted documents. The Court therefore declines Plaintiffs' request for *in camera* review.

## IV.    CONCLUSION

For the foregoing reasons, the Court will DISMISS Plaintiffs Moore, Orear, O'Malley, and Sauter from the suit, DENY remaining Plaintiffs' Motions for Summary Judgment and *In Camera* Inspection (ECF Nos. 41, 46), GRANT the CIA's Motion for Summary Judgment (ECF No. 37) and enter judgment in the CIA's favor.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak

Alexandria, Virginia                    United States District Judge
Date:  August 6, 2025